Shemia Fagan, OSB No. 093476
Email: sfagan@hkm.com
**HKM EMPLOYMENT ATTORNEYS LLP**
308 SW First Avenue, Suite 325
Portland, OR 97204
Telephone: (503) 482-8546
Facsimile: (503) 345-0806

*Attorneys for Plaintiffs Martha Laura Aviles-Valdez,*
*Carolyn Mason, and Juan Valdez*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **MARTHA LAURA AVILES-VALDEZ, CAROLYN MASON, and JUAN VALDEZ**, individuals,<br><br>Plaintiffs,<br><br>v.<br><br>**UMATILLA COUNTY**, a public body,<br><br>Defendant. | Case No._____<br><br>**COMPLAINT**<br>**Whistleblower Retaliation (ORS 659A.199); Whistleblower Retaliation by Public Employer (IRS 659A.303); Sex Discrimination (ORS 659A.030); Age Discrimination (ORS 659A.030); Violation of Procedural Due Process – Liberty Interest (42 U.S.C. §1983); Violation of First Amendment – Freedom of Association (42 U.S.C. §1983); Wrongful Termination in Violation of Public Policy (Common Law)**<br><br>**DEMAND FOR JURY TRIAL** |

## I.  INTRODUCTION

Plaintiffs Martha Laura Aviles-Valdez, Carolyn Mason, and Juan Valdez were public servants who cherished their roles as stewards of public funds and providers of services to the

1  -  COMPLAINT

community. After discovering unlawful activity and wasted public funds, they spoke out as whistleblowers and earned the ire of Defendant Umatilla County. Seeking to get rid of the whistleblowers, Defendant seized on a simple clerical error to create a faux-scandal, terminate the whistleblowers, and permanently tarnish their reputations.

For this Complaint, Plaintiffs allege as follows:

## II. NATURE OF THE ACTION

1. Plaintiff Martha Laura Aviles-Valdez ("Plaintiff Laura"), an individual, is a resident of Hermiston, OR.

2. Plaintiff Carolyn Mason ("Plaintiff Mason"), an individual, is a resident of Milton-Freewater, OR.

3. Plaintiff Juan Valdez ("Plaintiff Juan"), an individual, is a resident of Hermiston, OR.

4. At all materials times, Plaintiffs Laura and Juan were married.

5. Defendant Umatilla County is an Oregon public body with its principal place of business in Pendleton, OR.

## III. JURISDICTION AND VENUE

6. This Court has jurisdiction over Plaintiffs' claims for violation of procedural due process (Liberty Interest) pursuant to 42 U.SC. §1983 and 28 U.S.C. §1331. This Court has supplemental jurisdiction over Plaintiffs' state claims pursuant to 42 U.S.C. §1367 as the state claims arise from the same nucleus of operative facts as the federal claims.

7. Venue is proper within the District of Oregon, Pendleton Division, pursuant to 28 U.S.C. §1391(b) because all or substantially all of Plaintiffs' claims arose in this judicial district.

///

2 - COMPLAINT

## IV.  FACTUAL BACKGROUND

### A.  PARTIES

8.     At all material times, Defendant was an "employer" within the meaning of 42 U.S.C §1983, and ORS Chapter 659A.

9.     Commissioner George Murdock ("Commissioner Murdock") is the chair of Defendant's Board of Commissioners, and a supervisor for Defendant with authority to hire and fire employees, determine their pay, and is responsible for maintaining employee records.

10.    At all material times, Commissioner Murdock acted on behalf of Defendant.

11.    At all material times herein, Plaintiffs were employees of Defendant within the meaning of 42 U.S.C §1983, and ORS Chapter 659A.

12.    Beginning on September 1, 2014, Defendant employed Plaintiff Laura as an addiction-counseling specialist.  In December 2014, Plaintiff Laura was promoted to Child and Family Services supervisor.

13.    Defendant has employed Plaintiff Mason since February 1994.  On or about September 1, 2013, Plaintiff Mason was promoted to director of the Umatilla County Department of Human Services ("UCDHS").

14.    Beginning on February 14, 2008, Defendant employed Plaintiff Juan as an addictions counselor.  In December 2014, Plaintiff Juan was promoted to Clinical Supervisor within UCDHS.

15.    Commissioner Murdock was elected to Defendant's Board of Commissioners during a Special Election in May 2013.

///

3  -   COMPLAINT

**B. PLAINTIFF CAROLYN MASON AS A WHISTLEBLOWER AND VICTIM OF AGE AND GENDER DISCRIMINATION**

16.     Plaintiff Mason continually reported activities by Defendant that she believed in good faith were unlawful, unethical, and a gross waste of public funds.

17.     In or about January 2014, Defendant assigned Plaintiff Mason to supervise UCDHS' Community Access to Resource Effectiveness program ("CARE").

18.     As the supervisor of CARE, Plaintiff Mason applied for and maintained funding grants.

19.     On or about April 1, 2014, Plaintiff Mason secured a Mental Health Promotion and Prevention ("MHPP") grant from the state of Oregon.  The MHPP grant rules require that the grant be used to fund a bilingual CARE Specialist.

20.     After securing the MHPP grant, Defendant assigned Mayra Zepeda ("Zepeda") as a bilingual CARE Specialist with UCDHS.

21.     In order to maintain the MHPP grant, Plaintiff Mason had to submit a report to the state of Oregon semi-annually, approximately every six (6) months.  Among other things, the report had to confirm that the MHPP grant was used to fund a bilingual CARE Specialist at UCDHS.

22.     In or about September 2014, Commissioner Murdock and the Hermiston School District arranged for Zepeda to be on-site at Hermiston schools to provide human services to bilingual and monolingual Spanish-speaking families.  As part of the arrangement, the Hermiston school district reimbursed Defendant for full funding for Zepeda's bilingual CARE Specialist position at UCDHS.

23.     In or about October 2014, Defendant assigned Antonio Martinez to the position of CARE Specialist at UCDHS.  Martinez is bilingual and Defendant funded his position with the MHPP grant.

4  -   COMPLAINT

24. In or about November, 2014, Plaintiff Mason filed UCDHS' semi-annual report with the state of Oregon regarding Defendant's use of the MHPP grant to fund Martinez' bilingual CARE Specialist at UCDHS.

25. In or about November 2014, Martinez left CARE and UCDHS. Defendant did not hire another bilingual CARE Specialist as outlined in the MHPP grant requirements.

26. Plaintiff Mason complained several times to Commissioner Murdock that Defendant needed to immediately hire a new bilingual CARE Specialist at UCDHS or refuse the MHPP grant funds.

27. Commissioner Murdock informed Plaintiff Mason that Defendant would not hire a new bilingual CARE Specialist for UCDHS. He directed Plaintiff Mason to report that the MHPP grant funded Zepeda's position which was already being fully funded by the Hermiston school district.

28. Plaintiff Mason complained to Commissioner Murdock that "double dipping" funds from both the MHPP grant and the Hermiston school district for Zepeda's bilingual position was unlawful, unethical, and a gross waste of public funds.

29. Plaintiff Mason believed in good faith that failing to report the vacant bilingual position at CARE to the state of Oregon was unlawful, unethical, and a gross waste of public funds.

30. At a meeting in or about October 2014, the CARE Program Manager and Commissioner Murdock belittled Plaintiff Mason, accusing her of being "a barrier to" and "not supporting" CARE.

31. In or about November 2014, Plaintiff Mason began preparing the semi-annual report to the state of Oregon for the MHPP grant. Commissioner Murdock directed Plaintiff Mason to

5 - COMPLAINT

fraudulently report that the MHPP grant funded Zepeda's position. Plaintiff Mason refused to follow Commissioner Murdock's instructions because she believed doing so was unlawful, unethical, and a gross waste of public funds.

32.     When Plaintiff Mason refused, Commissioner Murdock found another method to fraudulently report that the MHPP grant funded Zepeda. Commissioner Murdock bragged to Plaintiff Mason he had succeeded in renewing the MHPP grant by reporting Zepeda's bilingual CARE Specialist position, despite her position continuing to be fully funded by the Hermiston school district.

33.     In addition to the tension growing between Plaintiff Mason and Commissioner Murdock over her whistleblowing, Commissioner Murdock also began to belittle Plaintiff Mason with derogatory comments about her status as an older woman.

34.     In or about December 2014, Commissioner Murdock instructed Plaintiff Mason to start looking for a new job. Commissioner Murdock asked questions about Plaintiff Mason's granddaughter and insisted that Plaintiff Mason should be interested in spending more time with her. Commissioner Murdock also made remarks regarding most of Defendant's new hires in public health "[being] in their 20s" and the fact that he is friends with their families.

35.     Commissioner Murdock continually bragged to Plaintiff Mason about hiring daughters of his friends who were "in their 20s."

36.     In or about November 2014, Commissioner Murdock hired Meghan DeBolt (29 years old) as Director of Public Health for Defendant. Commission Murdock made a point to tell Plaintiff Mason about how "young and attractive" DeBolt was.

6   -   COMPLAINT

37. In December 2014, Plaintiff Mason reported Commissioner Murdock's discriminatory comments to Defendant.

38. In or about January 2015, Defendant shared Plaintiff Mason's age-related complaints with Commissioner Murdock, but there was no discipline or recourse.

39. Defendant failed to investigate and/or remedy Commissioner Murdock's age discrimination against Plaintiff Mason.

40. Commissioner Murdock continued to make derogatory comments and retaliated against Plaintiff Mason in subtle but direct ways.

41. On or about February 3, 2015, Plaintiff Mason confronted Commissioner Murdock about his derogatory and retaliatory treatment toward her. He responded by "apologizing" in a sarcastic tone and then asked her in a belittling tone of voice, "do you feel better now?" Plaintiff Mason reported this meeting, including Commissioner Murdock's, remarks to Defendant.

42. Commissioner Murdock continued to make comments to Plaintiff Mason, and to others in front of Plaintiff Mason, about how "young and attractive" Ms. Debolt is.

### C. ALL PLAINTIFFS AS WHISTLEBLOWERS

43. In 2014, the Medicaid/Oregon Health Plan reimbursement rules were overhauled.

44. Oregon moved away from traditional fee-for-service reimbursements and toward capitated funding. This represented a comprehensive change in the way UCDHS received reimbursement for services provided to Medicaid/Oregon Health Plan members.

45. In or about April 2014, Defendant contracted with Greater Oregon Behavioral Health Inc. ("GOBHI") to administer its new Medicaid/Oregon Health Plan capitated funding for UCDHS.

7 - COMPLAINT

46.     Kevin Campbell, the CEO of GOBHI, and his family are longtime family friends of Commissioner Murdock.

47.     Beginning in or about October 2014, Commissioner Murdock served on the board of GOBHI alongside the CEOs several of private human service providers.

48.     On or about September 1, 2014 Defendant hired Plaintiff Laura as an Addictions Counseling Specialist.

49.     Plaintiff Laura was desirable because of her extensive experience working with GOBHI from her previous positions at public and private human service providers.

50.     Immediately after Defendant contracted with GOBHI, Plaintiff Mason asked GOBHI for comprehensive training on the new Medicaid/Oregon Health Plan reimbursement model. GOBHI did not provide any training.

51.     In an effort to find efficiencies and financial savings, Plaintiff Mason directed Plaintiffs Laura and Juan to audit UCDHS' service delivery system.  Based on monthly financial information from GOBHI, Plaintiff Laura quickly discovered several questionable costs, including that UCDHS paid excessive administrative costs to GOBHI.

52.     Plaintiff Laura shared this information with Plaintiffs Mason and Juan.

53.     Plaintiff Mason reported the questionable costs and excessive fees to Commissioner Murdock because of his role as a board member for Defendant and GOBHI.

54.     Upon further investigation, Plaintiffs Laura, Mason and Juan concluded that GOBHI was underfunding UCDHS for the benefit of the private human services providers whose CEOs served on the GOHBI board with Commissioner Murdock.

8  -   COMPLAINT

55. In consultation with Plaintiffs Laura and Juan, Plaintiff Mason began questioning GOHBI about excessive administrative fees and the inequities in funding between UCDHS and the private providers.

56. Instead of appreciating Plaintiffs Laura, Juan and Mason for stewardship of public funds, Commissioner Murdock began to exclude them from critical meetings with GOHBI.

57. Plaintiffs Mason, Laura and Juan suspected that Commissioner Murdock was not acting in Defendant's best interest or being a careful steward of public funds as a GOBHI board member and personal friend of GOBHI CEO, Kevin Campbell.

58. After being excluded from GOBHI meetings with Defendant, Plaintiffs Mason, Laura and Juan began attending GOBHI-related community meetings and publicly asking questions about funding inequities and administrative costs.

59. After constant public questions about GOBHI, Plaintiff Mason had a private meeting with the chief financial officer of GOBHI. Plaintiff Mason learned that GOBHI owed UCDHS at least $50,000 in Medicaid/Oregon Health Plan funds.

60. Plaintiffs Mason, Laura and Juan began to suspect GOBHI's funding distribution practices were not approved by the state of Oregon.

61. Plaintiffs Mason and Laura reported their concerns to Commissioner Murdock in both of his roles for Defendant and as a GOBHI Board member.

62. In order to access the $50,000 in reimbursements GOBHI owed to UCDHS, GOBHI told Plaintiff Mason that UCDHS had to apply for a grant by submitting a detailed proposal for a new program.

9 - COMPLAINT

63. Plaintiffs Mason, Laura and Juan used their collective sixty-five (65) years of experience as human services professionals to write detailed grant proposals for coordinating family services and addiction counseling services.

64. Plaintiffs presented proposal after proposal to Commissioner Murdock and GOBHI. Each time, the grant application was immediately denied without further explanation.

65. On information and belief, other private providers, whose CEOs served on the GOBHI board, were simply asked to send an email to GOBHI with a brief rationale to request the same funds.

66. Commissioner Murdock had knowledge of the inequitable treatment UCDHS experienced with GOBHI because of Plaintiffs' complaints and his role as a GOBHI Board member.

67. Plaintiffs Mason, Laura and Juan continued to attend GOBHI-related community meetings and question reimbursement inequities and excessive administrative costs.

68. Plaintiff Laura was most vocal at the GOBHI meetings because she had recent experience working with a private GOBHI provider.

69. Eventually, at the request of GOBHI, Commissioner Murdock forbade Plaintiff Laura from attending any GOBHI meetings.

70. Plaintiffs Mason, Laura and Juan reported because they believed in good faith that the excessive administrative costs and inequities in reimbursements constituted a gross waste of public funds.

///

///

10 - COMPLAINT

## D. MEDICAID/OREGON HEALTH PLAN MOVES AWAY FROM FEE-FOR-SERVICE MODEL TO CAPITATED FUNDING

71. UCDHS provided mental health screenings and counseling to Medicaid and non-Medicaid patients in Umatilla County. Under the traditional fee-for-service model, UCDHS submitted screenings provided to Medicaid patients to Medicaid/Oregon Health Plan and received payment for those screenings.

72. In 2014, the Medicaid/Oregon Health Plan reimbursement rules were overhauled. Oregon moved away from the traditional fee-for-service model and toward capitated funding. This represented a comprehensive change in the way UCDHS received reimbursement for services provided to Medicaid patients.

73. Capitation is a payment arrangement for health care service providers that pays a provider, or group of providers, a set amount for each enrolled individual assigned to the region (e.g., Umatilla County), per period of time, whether or not that individual seeks care.

74. In short, Oregon Health Plan no longer paid for each screening submitted by UCDHS.

75. In or about January 2015, GOBHI and Commissioner Murdock decided that UCDHS needed to show Medicaid/Oregon Health Plan the entire amount of services that UCDHS provides in Umatilla County, not just services to Medicaid patients.

76. GOBHI, with Commissioner Murdock's knowledge, instructed Plaintiffs Mason, Laura and Juan to keep track of all screenings, even non-Medicaid screenings, to see the total amount of services UCDHS provides to patients in Umatilla County.

77. Plaintiffs Mason, Laura and Juan asked GOBHI and Commissioner Murdock for comprehensive training about how to track of all the screenings and submit these non-Medicaid screenings.

11 - COMPLAINT

78. No comprehensive training was provided, however, GOBHI and Commissioner Murdock instructed UCDHS to keep track of non-Medicaid screenings by entering them into UCHDS' computer system under the Medicaid screenings code.

79. As instructed, Plaintiff Mason directed the UCDHS billing clerk to enter the non-Medicaid screenings under the Medicaid screening code, but not to submit the non-Medicaid screenings to Medicaid/Oregon Health Plan.

80. In the event that erroneous screenings were submitted, however, no payment would be received for the screenings because, as laid out above, Medicaid/Oregon Health Plan no longer used the traditional fee-for-service model.

81. In the event that screenings were erroneously submitted, the Medicaid/Oregon Health Plan "Claim Adjustment Handbook" outlines simple procedures for correcting erroneously submitted Medicaid claims.

82. On information and belief, in or about April 2015, UCDHS' billing clerk accidentally began submitting many of the non-Medicaid screenings that were not supposed to be submitted.

83. On information and belief, the submission errors were discovered in or about April 2015 when Medicaid/Oregon Health Authority returned the non-Medicaid screenings to UCDHS due to insufficient information.

84. No payment was sought or received for the erroneously submitted screenings. In fact, erroneously submitted screenings did not cause a problem because the Medicaid/Oregon Health Plan Handbook outlines a simple procedure for correcting erroneously submitted Medicaid claims.

12 - COMPLAINT

85.     Furthermore, the GOBHI Manual, which was never provided to Plaintiffs, also outlined a simple procedure for correcting erroneously submitted Medicaid claims.

86.     Defendant did not inform Plaintiffs that non-Medicaid screenings had been erroneously submitted to Medicaid/Oregon Health Plan for payment.

87.     If Defendant had informed Plaintiffs about the erroneously submitted screenings, they could have easily fixed the error using the simple procedures laid out in the Medicaid/Oregon Health Plan Handbook.

**E.  DEFENDANT USES SIMPLE ERROR AS AN OPPORTUNITY TO CREATE A FAUX-SCANDAL AND OUST THE WHISTLEBLOWERS**

88.     Defendant did not tell Plaintiffs about the erroneously submitted screenings or give them the opportunity to follow the simple procedure to remedy the billing clerk's error.

89.     Commissioner Murdock used the billing clerk's simple error as an opportunity to create a faux-scandal in order to oust whistleblower Plaintiffs Mason, Laura and Juan.

90.     Plaintiff Juan was additionally targeted because of his marriage to Plaintiff Laura.

91.     On April 22, 2015, Plaintiffs received "Notice of Suspension" letters from Defendant, placing Plaintiffs on administrative leave without any explanation.

92.     On information and belief, Defendant leaked the investigation to the East Oregonian newspaper and identified Plaintiff Mason by name and Plaintiffs Laura and Juan implicitly.

93.     On April 23, 2015, the East Oregonian newspaper published a story entitled "Umatilla County Human Services Director Under Investigation." The article contains quotes from Commissioner Murdock and Defendant's counsel that were stigmatizing to Plaintiffs.

94.     On May 11, 2015, Plaintiffs received a "Notice of Investigation" letter with two vague allegations and were informed there would be a hearing on the allegations two days later.

13 -    COMPLAINT

95. Defendant did not tell Plaintiffs that the billing clerk accidentally submitted non-Medicaid screenings until they had been on administrative leave for three (3) weeks.

96. By the time Plaintiffs first learned about the billing clerk's mistake, Defendant had already made the decision to terminate Plaintiffs.

97. On May 13, 2015, in separate hearings with Defendant, Plaintiffs were provided with the first vague allegations that allowed them to guess that that non-Medicaid screenings had accidentally been submitted to Medicaid/Oregon Health Plan.

98. On May 13, 2015, over three (3) weeks after being put on administrative leave, Plaintiffs had their first opportunity to explain the billing clerk's error to Defendant. At this time, Plaintiff Mason pointed out the simple procedure in the Medicaid/Oregon Health Plan and GOBHI Manuals for correcting the error.

99. Defendant had no interest in learning that the billing clerk's error created no problems and was easily remedied. Defendant had already decided the simple error provided a pretext for Defendant to terminate the whistleblowers.

100. The May 13 hearing, and another held on May 20, were charades and did not, nor were they intended to, give Plaintiffs a meaningful opportunity to be heard.

101. On June 4, 2015, Defendant terminated Plaintiffs.

102. On information and belief, Umatilla County directly or indirectly reported to the East Oregonian that Plaintiffs were under criminal investigation by the Oregon Department of Justice ("DOJ").

///

///

14 - COMPLAINT

103. On June 5, 2015, the East Oregonian newspaper published a story entitled "Umatilla County Fires Three as DOJ Takes the Case." Plaintiffs were named in the newspaper story and claimed to be under criminal investigation by the Oregon DOJ.

104. On information, Plaintiffs have never been under investigation by the Oregon DOJ.

105. On information, the Oregon DOJ has no plans to launch any investigations involving Plaintiffs.

## F. DEFENDANT TARNISHES PLAINTIFFS' REPUTATIONS AND DENIES THEM DUE PROCESS

106. On June 5, 2015, Defendant offered Plaintiffs Name Clearing Hearings, noting that information Defendant would provide to the press was "potentially stigmatizing." Defendant gave Plaintiffs the deadline of June 8, 2015 at 5:00PM for Name Clearing Hearing requests.

107. Before 5:00PM on June 8, 2014, Plaintiffs sent Defendant written requests for Name Clearing Hearings.

108. Defendant did not even respond to Plaintiffs' Name Clearing Hearing requests and did not offer Plaintiffs any opportunity to clear their names.

109. On June 5, 2015, the East Oregonian published a story entitled "Umatilla County Fires Three as DOJ Takes the Case." The newspaper story included false and extremely stigmatizing information about Plaintiffs.

110. On November 23, 2015, within 180 days of their terminations, Plaintiffs sent an Oregon Tort Claims Notice to Defendant in accordance with ORS 30.275.

111. On December 3, 2015, six (6) months after Plaintiffs requested Name Clearing Hearings, and in response to Plaintiffs' Oregon Tort Claims Notice, Defendant finally offered Plaintiffs

15 -   COMPLAINT

Name Clearing Hearings. Defendant's offer was untimely and failed to give Plaintiffs a meaningful opportunity to be heard.

112. Plaintiffs Laura and Mason are unable to find new employment because of the stigmatizing information published, or caused to be published, by Defendant.

113. Plaintiff Juan is also unable to find new employment, and had a job offer rescinded, as a direct result of the stigmatizing information published, or caused to be published, by Defendant.

## V.  CLAIMS FOR RELIEF

### A.  FIRST CLAIM FOR RELIEF: WHISTLEBLOWER RETA.LIATION
### (ORS 659A.199)
### ON BEHALF OF ALL PLAINTIFFS

114. Plaintiffs reallege and incorporate Paragraphs 1 through 113 as if fully set forth herein.

115. Defendant discriminated against Plaintiffs in the terms, conditions and/or privileges of employment due to Plaintiffs' good-faith reporting to their superiors of information that they believed was evidence of violations of state law. As such, their disclosures and speaking out on such matters as whistleblowers were protected activities.

116. Defendant's actions, its agents and employees acting within the course and scope of their duties as set forth above and incorporated into this paragraph, violated Plaintiffs' rights under ORS 659A.199.

117. Plaintiffs' protected activity was a substantial and motivating factor for the above described retaliatory actions and decisions made by Defendant, including but not limited to their termination.

///

///

16 -   COMPLAINT

118. As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have suffered economic damages and noneconomic damages and are entitled to an award of lost wages and benefits in an amount to be determined, plus prejudgment interest.

119. Plaintiffs are entitled to recover their reasonable attorney's fees and costs pursuant to ORS 659A.885.

**B. SECOND CLAIM FOR RELIEF: WHISTLEBLOWER RETALIATION BY PUBLIC EMPLOYER (ORS 659A.203) ON BEHALF OF ALL PLAINTIFFS**

120. Plaintiffs reallege and incorporate Paragraphs 1 through 119 as if fully set forth herein.

121. Defendant discriminated against Plaintiffs in the terms, conditions and/or privileges of employment due to Plaintiffs' good-faith disclosure of information that they believed was evidence of violations of state law, mismanagement, gross waste of funds and/or abuse of authority. As such, their disclosures and speaking out on such matters as whistleblowers were protected activities.

122. Defendant's actions, its agents and employees acting within the course and scope of their duties as set forth above and incorporated into this paragraph, violated Plaintiffs' rights under ORS 659A.203.

123. Plaintiffs' protected activity was a substantial and motivating factor for the above described retaliatory actions and decisions made by Defendant, including but not limited to their termination.

124. As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have suffered economic damages and noneconomic damages and are entitled to an award of lost wages and benefits in an amount to be determined, plus prejudgment interest.

17 - COMPLAINT

125. Plaintiffs are entitled to recover their reasonable attorney's fees and costs pursuant to ORS 659A.885(a).

### C. THIRD CLAIM FOR RELIEF: SEX DISCRIMIATION (ORS 659A.030) ON BEHALF OF PLAINTIFF CAROLYN MASON

126. Plaintiff Mason realleges and incorporates Paragraphs 1 through 125 as if fully set forth herein.

127. Defendant's conduct, as alleged above, violated ORS 659A.030, which makes discrimination against employees on the basis of sex illegal.

128. As alleged above, Defendant discriminated against Plaintiff Mason in the terms, conditions and/or privileges of employment due to Plaintiff Mason's sex.

129. Defendant's actions, its agents and employees acting within the course and scope of their duties as set forth above and incorporated into this paragraph, violated Plaintiff Mason's rights under ORS 659A.030.

130. Plaintiff Mason's sex was a substantial and motivating factor for the above described retaliatory actions and decisions made by Defendant, including but not limited to her termination.

131. As a direct and proximate result of Defendant's wrongful conduct, Plaintiff Mason is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory practices unless and until the court grants relief.

132. As a direct and proximate cause of Defendant's actions, Plaintiff Mason has suffered noneconomic damages, including but not limited to severe emotional distress, anguish, humiliation, fear, and anxiety. As a result, Plaintiff Mason is entitled to an award of noneconomic compensatory damages in an amount to be determined by a jury at the time of trial.

18 - COMPLAINT

133. As a direct and proximate cause of Defendant's actions, Plaintiff Mason has suffered economic damages, including but not limited to loss of earnings, loss of benefits, loss of job opportunities, damage to professional reputation and other employment benefits, which will likely continue to accrue in an amount to be determined buy a jury at the time of trial.

134. Defendant's actions were malicious and reckless, entitling Plaintiff Mason to an award of punitive damages in an amount to be determined by a jury at the time of trial.

135. Plaintiff Mason is entitled to compensatory damages, any lost wages and benefits, injunctive declaratory relief and attorney's fees and costs pursuant to ORS 659A.885.

### D. FOURTH CLAIM FOR RELIEF: AGE DISCRIMINATION (ORS 659A.030) ON BEHALF OF PLAINTIFF CAROLYN MASON

136. Plaintiff Mason realleges and incorporates Paragraphs 1 through 135 as if fully set forth herein.

137. Defendant's conduct, as alleged above, violated ORS 659A.030, which makes discrimination against employees on the basis of age illegal.

138. As alleged above, Defendant discriminated against Plaintiff Mason in the terms, conditions and/or privileges of employment due to Plaintiff Mason's age.

139. Defendant's actions, its agents and employees acting within the course and scope of their duties as set forth above and incorporated into this paragraph, violated Plaintiff Mason's rights under ORS 659A.030.

140. Plaintiff Mason's age was a substantial and motivating factor for the above described retaliatory actions and decisions made by Defendant, including but not limited to her termination.

19 - COMPLAINT

141. As a direct and proximate result of Defendant's wrongful conduct, Plaintiff Mason is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory practices unless and until the court grants relief.

142. As a direct and proximate cause of Defendant's actions, Plaintiff Mason has suffered noneconomic damages, including but not limited to severe emotional distress, anguish, humiliation, fear, and anxiety. As a result, Plaintiff Mason is entitled to an award of noneconomic compensatory damages in an amount to be determined by a jury at the time of trial.

143. As a direct and proximate cause of Defendant's actions, Plaintiff Mason has suffered economic damages including, but not limited to, loss of earnings, loss of benefits, loss of job opportunities, damage to professional reputation and other employment benefits, which will likely continue to accrue in an amount to be determined by a jury at the time of trial.

144. Defendant's actions were malicious and reckless, entitling Plaintiff Mason to an award of punitive damages in an amount to be determined by a jury at the time of trial.

145. Plaintiff Mason is entitled to compensatory damages, any lost wages and benefits, injunctive declaratory relief and attorney's fees and costs pursuant to ORS 659A.885.

## E. FIFTH CLAIM FOR RELIEF: VIOLATION OF PROCEDURAL DUE PROCESS – LIBERTY INTEREST (42 U.S.C. §1983) ON BEHALF OF ALL PLAINTIFFS

146. Plaintiffs reallege and incorporate Paragraphs 1 through 145 as if fully set forth herein.

147. Plaintiffs have liberty interests in their reputations for honesty, fairness, and competence.

148. The information published by Defendant about Plaintiffs was false, misleading, and stigmatized Plaintiffs by shedding negative light on their integrity, professionalism, honesty, fairness, and competence.

20 - COMPLAINT

149. Prior to Plaintiffs' terminations, Defendant did not provide meaningful hearings before an impartial decision-maker.

150. Immediately following their terminations, Plaintiffs' timely requested Name Clearing Hearings in order to have a meaningful opportunity to preserve their reputations and clear their names.

151. Defendant failed to provide Plaintiffs with a meaningful post-termination opportunity to be heard before an impartial decision-maker, present evidence or cross-examine witnesses in connection with the false, misleading, and stigmatizing information published by Defendant.

152. As a result of Plaintiffs' deprivation of due process rights, Plaintiffs have been unable to find comparable employment in their community.

153. As a direct result of their terminations and deprivation of due process, Plaintiffs have suffered economic damages, including but not limited to loss of earnings, loss of benefits, loss of job opportunities, damage to professional reputation and other employment benefits, which will likely continue to accrue in an amount to be determined byy a jury at the time of trial.

154. As a direct result of their terminations and deprivation of due process, Plaintiffs have suffered noneconomic damages, including but not limited to severe emotional distress, anguish, humiliation, fear, and anxiety. As a result, Plaintiffs are entitled to an award of noneconomic compensatory damages in an amount to be determined by a jury at the time of trial.

155. Plaintiffs are entitled to compensatory damages, any lost wages and benefits, injunctive declaratory relief and attorney's fees and costs pursuant to 42 U.S.C. § 1988.

///

///

21 - COMPLAINT

**F. SIXTH CLAIM FOR RELIEF: VIOLATION OF FIRST AMENDMENT – FREEDOM OF ASSOCIATION (42 U.S.C. §1983) ON BEHALF OF PLAINTIFF JUAN VALDEZ**

156. Plaintiff Juan realleges and incorporates Paragraphs 1 through 155 as if fully set forth herein.

157. Plaintiff Juan has a constitutional right to freedom of association.

158. As alleged above, Defendant discriminated against Plaintiff Juan in the terms, conditions and/or privileges of employment due to Plaintiff Juan's marital relationship with whistleblower Plaintiff Laura.

159. Defendant's actions, its agents and employees acting within the course and scope of their duties as set forth above and incorporated into this paragraph, violated Plaintiff Juan's rights under 42 U.S.C. §1983.

160. As a direct result of his termination and deprivation of freedom of association, Plaintiff Juan has suffered economic damages, including but not limited to loss of earnings, loss of benefits, loss of job opportunities, damage to professional reputation and other employment benefits, which will likely continue to accrue in an amount to be determined by a jury at the time of trial.

161. Plaintiff Juan has suffered noneconomic damages, including but not limited to severe emotional distress, anguish, humiliation, fear, and anxiety. As a result, Plaintiff Juan is entitled to an award of noneconomic compensatory damages in an amount to be determined by a jury at the time of trial.

162. Plaintiff Juan is entitled to compensatory damages, any lost wages and benefits, injunctive declaratory relief and attorney's fees and costs pursuant to 42 U.S.C. §1988.

22 - COMPLAINT

## G. SEVENTH CLAIM FOR RELIEF: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY (COMMON LAW) ON BEHALF OF ALL PLAINTIFFS

163. Plaintiffs reallege and incorporate Paragraphs 1 through 162 as if fully set forth herein.

164. Defendant retaliated and discriminated against Plaintiffs, thereby interfering with an important societal obligation, and/or terminated Plaintiffs while they pursued important rights related to each of their roles as an employee, including but not limited to reporting unlawful activity and wasted public funds.

165. Plaintiffs' statutory claims do not provide adequate remedies for relief. Therefore, they are entitled to such remedies as exceed those awarded under other claims.

166. As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have suffered significant economic damages and noneconomic damages, and are entitled to an award of lost wages and benefits from the dates of their termination until trial in an amount to be determined at trial, plus front pay and prejudgment interest.

## VI. JURY TRIAL DEMAND

167. Plaintiffs demand a jury trial on all questions of fact or combined questions of law and fact raised by this Complaint.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request the Court to:

1. Assume jurisdiction over each of the causes set forth herein;

2. Declare that Defendant has violated Plaintiffs' constitutionally protected rights and an order requiring Defendant to correct this deficiency;

23 - COMPLAINT

3. Grant a permanent injunction enjoining Defendant, its owners, officers, management personnel, employees, agents, successors, and assigns, and all persons in active concert or participation with Defendant, from engaging in any employment practice which retaliates against an employee on the basis of their exercising their right to free speech and whistleblowing matters of public concern on such terms as the court may direct;

4. Grant equitable relief including but not limited to an expungement of all negative references to allegations of false statements and/or impropriety that may be in Plaintiffs' personnel files;

5. Order Defendant to create, implement and carry out policies, practices and programs providing for equal employment opportunities which affirmatively eradicate the effects of past and present unlawful employment practices, on such terms as the court may direct;

6. Order Defendant to make Plaintiffs whole by compensating Plaintiffs for past and future pecuniary losses, including expenses, impairment of earning capacity, lost past and future earnings and benefits of employment, and such other losses as are awarded by a jury or otherwise established at trial;

7. Order Defendant to pay Plaintiffs awards of compensatory damages for non- pecuniary losses, including physical and emotional injury, pain and suffering, mental anguish, humiliation, and embarrassment, and loss of enjoyment of life in an amount to be determined by a jury;

///

///

///

///

24 - COMPLAINT

8.     Award Plaintiffs their costs of suit and reasonable attorney's fees, costs and expert witness fees; and

9.     Order Defendant to pay prejudgment and post judgment interest, as appropriate, on all amounts due to plaintiff as a result of this action.

**DATED:** February 23, 2016.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: *s/ Shemia Fagan*
    Shemia Fagan, OSB No. 093476
    Email: sfagan@hkm.com
    308 SW First Avenue, Suite 325
    Portland, OR 97204
    Telephone: (503) 482-8546
    Facsimile: (503) 345-0806

*Attorneys for Plaintiffs Martha Laura Aviles-Valdez, Carolyn Mason and Juan Valdez*

25 -    COMPLAINT